Michael F. WALSH, etc., Petitioner,
Appellant,

v.

INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION, AFL–CIO, LOCAL 799,

International Longshoremen's Associa-
tion, AFL–CIO, Respondents,
Appellees.

No. 80-1330.

United States Court of Appeals,
First Circuit.

Argued Aug. 1, 1980.

Decided Sept. 17, 1980.

James Holcomb, Washington, D. C., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Harold J. Datz, Associate Gen. Counsel, Joseph E. Mayer, Asst. Gen. Counsel, and Peter B. Mirsky, Deputy Asst. Gen. Counsel, Washington, D. C., on brief, for petitioner, appellant.

Duane R. Batista, Danielle de Benedictis, William G. Ferris, and Nutter, McLennen & Fish, Boston, Mass., on brief, for Allied International, Inc., amicus curiae.

Ernest L. Mathews, Jr., New York City, with whom Gary G. Nicolosi, Andre Mazzola Mardon, New York City, Joseph Doyle, Condon & Doyle, Boston, Mass., and Thomas W. Gleason, New York City, on brief, for respondents, appellees.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

This is an appeal from a decision of the district court denying a preliminary injunction under section 10(*l*) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(*l*).

The facts are essentially undisputed. In December of 1979, armed forces of the USSR invaded Afghanistan. In protest of that action, on January 9, 1980, Thomas Gleason, President of the International Longshoremen's Association (ILA), ordered members of the ILA to cease handling cargoes bound for or arriving from the USSR and all cargoes traveling on ships of USSR registry.[1]

As a result of this order, ILA locals in ports along the Atlantic and Gulf coasts have refused to refer members for work involving Soviet ships or cargoes.

This policy has prevented the loading and unloading of cargoes belonging to various shippers in these ports. At least three such shippers have responded by filing charges with the NLRB against the ILA and the particular locals involved. These charging parties have characterized the ILA's policy as a secondary boycott in violation of section 8(b)(4)(i), (ii)(B) of the National Labor Relations Act—that is, a refusal by the union to handle goods associated with the USSR in an attempt to force the shippers, the carriers, and/or the stevedores to cease doing business with the USSR or with each other.

The Board has adopted this characterization of the ILA's policy. While the charges are pending with the Board, at least three regional directors have brought actions in three federal district courts seeing preliminary injunctions under section 10(l) of the NLRA, 29 U.S.C. § 160(l). First, the regional director of region 23 brought an action in the Southern District of Texas[2] in response to charges filed with the Board by the Kansas and Texas Farm Bureaus and the American Farm Bureau Federation. The farm bureaus had filed the charges because locals of the ILA had refused to refer longshoremen to load grain bound for the USSR aboard the Belgium, a ship of Belgian registry under charter by a Soviet chartering company. The District Court for the Southern District of Texas, in an unpublished memorandum and opinion dated February 15, 1980, denied the Board's petition on the ground that the dispute was not "in commerce," so that the Board had no jurisdiction over it.

The regional director of region 10 brought the second section 10(l) petition in the Southern District of Georgia,[3] in response to a charge filed by Occidental Chemical Corporation, a manufacturer of chemical products which had been unable to receive its shipments of raw materials originating in the USSR because of the refusal of the ILA local in Savannah to unload the goods. In an unpublished opinion dated March 4, 1980, the district court rejected the union's assertion of res judicata, found jurisdiction in the Board, and issued the requested injunction. That injunction is currently in effect and prevents the ILA from pursuing its policy in the ports of Savannah and Brunswick, Georgia. The rulings of both the Texas and Georgia district courts are currently on appeal to the Court of Appeals for the Fifth Circuit.

---

1. The directive stated:

"In response to overwhelming demands by the rank and file members of the Union, the leadership of the ILA today ordered immediate suspension in handling all Russian ships and all Russian cargoes in ports from Maine to Texas and Puerto Rico where ILA workers are employed.

This order is effective, across the board on all vessels and all cargoes. Grain and other foods as well as high valued general freight. However, any Russian ship now in process of loading or discharging at a waterfront will be worked until completion.

The reason for this action should be apparent in light of international events that have affected relations between the U.S. & Soviet Union.

However, the decision by the Union leadership was made necessary by the demands of the workers.

It is their will to refuse to work Russian vessels and Russian cargoes under present conditions of the world.

People are upset and they refuse to continue the business as usual policy as long as the Russians insist on being international bully boys. It is a decision in which the Union leadership concurs."

2. Baldovin v. ILA, Houston Division, Civil No. 80-259.

3. Mack v. ILA, Savannah Division, CV 480-051.

The action which led to this appeal was brought by the regional director of region 1 on March 26, 1980 in response to a charge filed by Allied International, Inc., an American importer of wood products. Allied had purchased certain wood products from the USSR and arranged to have them transported to various east coast ports by Waterman Steamship Lines, a domestic company operating ships of U.S. registry. At the time of president Gleason's announcement, one such ship was in the port of Boston, where a portion of Allied's products was scheduled to be unloaded. The ship was scheduled to make further stops at other ports for additional unloading. However, because of the ILA's policy as announced by president Gleason, Waterman was informed that ILA members would not unload the Soviet wood products from that ship at any ports beyond Boston, and that they would not unload Soviet cargo from any later ships. As a result, Waterman unloaded all of Allied's cargo in Boston, rerouted a later ship to Montreal and cancelled its agreement to transport Soviet wood products for Allied on a third ship.

In the district court, the respondents asserted that the decision of the district court for the Southern District of Texas in *Baldovin* barred this action under the doctrine of res judicata. Respondents also argued that the Board lacked jurisdiction over the dispute, that it lacked reasonable cause to believe that an unfair labor practice had occurred, and that the union's action was a form of political expression protected by the first amendment. In a memorandum and order dated April 30, 1980, the district court rejected the claim of res judicata and found jurisdiction in the Board, but also found no reasonable cause to believe that an unfair labor practice had occurred.[4] The court therefore denied the petition.

In this court, the Board argues that the district court was incorrect in its conclusion that there was no reasonable cause to believe that an unfair labor practice had occurred. The ILA renews its jurisdictional and first amendment defenses while supporting the district court's conclusion on the secondary boycott issue. Neither party raised the issue of res judicata. However, since it appeared that the doctrine might be dispositive of the case, we ordered the parties to submit supplementary briefs on the issue. After reviewing those briefs along with relevant portions of the records in the *Baldovin* and *Mack* cases, we have concluded that this action is barred by the decision of the district court in *Baldovin*. We therefore vacate the judgment of the district court insofar as it is based upon the grounds stated in the court's opinion and remand with directions that the petition be dismissed simply on the ground of res judicata.

## I. *The Preclusive Effect of Decisions Under Section 10(l)*

Res judicata [5] is a judicially created rule that bars relitigation of claims and issues that have been previously determined. The outlines of the rule are clearly set forth in *Commissioner v. Sunnen*, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1947):

"The rule provides that when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose." (Citations omitted.)

Under the narrower rule of collateral estoppel,

"Where the second action between the same parties is upon a different cause or demand ... the judgment in the prior action operates as an estoppel, not as to

---

4. The district court also suggested that the ILA's conduct was a form of political expression, but the decision does not appear to have been based on the first amendment.

5. We will use the term "res judicata" to refer to the general concept of the preclusion of a claim or issue because of a previous judicial determination, including the doctrine of collateral estoppel.

matters which might have been litigated and determined, but 'only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered'." (Citations omitted.)

*Id.* at 597–98, 68 S.Ct. at 719.

The Supreme Court described the purposes and importance of these two related doctrines in its recent opinion in *Montana v. United States*, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979):

"Application of both doctrines is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions. . . . [Citations omitted]. To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions."

*Id.* at 153–54, 99 S.Ct. at 974.

As these purposes relate to all kinds of litigation, res judicata and collateral estoppel have been applied to every category of cases. *Cf. St. Louis Typographical Union v. Herald Co.*, 402 F.2d 553, 555 (8th Cir. 1968) (calling res judicata a "principle of universal jurisprudence"). Nevertheless, the Board argues, and the district court in this case held, that decisions in proceedings under section 10(*l*), because of their preliminary and ancillary nature, should not be treated as final judgments so as to trigger the application of these doctrines. The parties have cited no cases, other than the district court decision in this case, which directly address the question of the preclusive effect of decisions in section 10(*l*) proceedings, nor have we found any such cases. We therefore address the question as one of first impression.[6]

Section 10(*l*) of the National Labor Relations Act directs regional directors of the Board to seek preliminary injunctive relief in a district court, pending final adjudication by the Board, whenever they have reasonable cause to believe that certain specified unfair labor practices have occurred. 29 U.S.C. § 160(*l*). "The purpose of the § 10(*l*) injunction is to preserve the status quo in order that the ultimate decision of the Board would not be negated or rendered moot by intervening events." *Compton v. National Maritime Union*, 533 F.2d 1270, 1276 (1st Cir. 1976). A decision in a section 10(*l*) proceeding is, by the nature of the proceeding, limited in time and scope; the decision settles only the issue of reasonable cause, *see Union de Tronquistas v. Arlook*, 586 F.2d 872, 876 (1st Cir. 1978), and the relief, if granted, is effective only while the unfair labor practice charge is pending before the Board, *Sears, Roebuck & Co. v. Carpet Layers*, 397 U.S. 655, 90 S.Ct. 1299, 25 L.Ed.2d 637 (1970). Because of these limitations, a section 10(*l*) decision is not a final decision on the merits of the underlying unfair labor practice charge, and it does not bar further litigation of the issues involved in that charge, either before the Board, or in an enforcement proceeding in the court of appeals. *NLRB v. Denver Building & Construction Council*, 341 U.S. 675, 681–83, 71 S.Ct. 943, 947, 948, 95 L.Ed. 1284 (1951).

The limited effect of a section 10(*l*) decision flows naturally from the limited role of the district court in hearing the petition. The court does not decide whether an unfair labor practice has occurred; that decision is for the Board, subject to review by the court of appeals. Since no decision has been rendered on that issue when the charge reaches the Board, there is nothing to preclude its consideration of the charge.

But the district court in a section 10(*l*) proceeding does decide the limited issue of

---

**6.** Three cases in other circuits do touch on this question tangentially: all three suggest, although they do not actually hold, that decisions under section 10(*l*) would have the same preclusive effects as any other decisions. *Madden v. Perry*, 264 F.2d 169 (7th Cir. 1959); *Cosentino v. Local 28*, 268 F.2d 648 (8th Cir. 1959); *NLRB v. Acker Industries*, 460 F.2d 649 (10th Cir. 1972).

whether there is reasonable cause to believe that a violation has occurred so that injunctive relief is warranted. We have been offered no persuasive reason to view that decision on that narrow issue as anything but a final decision for purposes of res judicata. In our view, the policies underlying the rule of res judicata apply as well to decisions on section 10(*l*) as to other decisions. The parties in a section 10(*l*) proceeding have "full and fair opportunity to litigate" the narrow issue which is placed before the district court, *see Montana v. United States, supra,* 440 U.S. at 154, 99 S.Ct. at 974. Section 10(*l*) provides for a hearing in the district court of which all persons involved in the charge must be notified and in which all such persons must be permitted to appear and present testimony, 29 U.S.C. § 160(*l*). The party against whom the petition is decided may appeal to the court of appeals, as the Board has done in this case, 28 U.S.C. § 1292(a).

Once the Board has been afforded this opportunity to have its petition heard and adjudicated in the district court and to appeal the denial of relief to the court of appeals, we see no reason to permit it to bring a second petition against the same respondent based on the same underlying charge. This type of repetition, which would be as expensive and vexatious to the respondent as any other type of litigation, is exactly what the rule of res judicata is designed to prevent. The waste of judicial resources involved in hearing such multiple petitions would be as great as that resulting from any other repetitive litigation. This very case illustrates that point; three district courts and two appellate courts have been called upon to consider section 10(*l*) petitions arising from the same underlying controversy between the Board and the same union. (See Section II, B, below, where we discuss in detail the identity of the parties.)

Finally, the possibility of inconsistent decisions is as great and as troublesome under section 10(*l*) as in any other area of the law. Again, this case illustrates the danger; three district courts have reached different conclusions on the same issues, with the result that longshoremen in Savannah are currently enjoined from complying with a union policy which their counterparts in Houston and Boston are free to observe.[7] Ultimately, we may assume, consistency will be achieved when the Board itself resolves the charges arising from the ILA's January 9 directive regarding Soviet cargoes. But this may not occur for some time; in the interim the decisions will point in different directions.

■ The policies behind the rule of res judicata therefore weigh in favor of giving those decisions the same preclusive effect as any other category of judicial rulings. No countervailing policy has been called to our attention that would lead us to a contrary result. The Board argues that a ruling on a petition by one regional director, filed under pressure of time after incomplete investigation, should not be allowed to preclude later petitions by other regional directors, since preclusion by such a ruling could thwart the intent of Congress to provide quick relief from the evils of secondary boycotts. What this argument boils down to is an assertion that the district court deciding the first petition might be wrong. But a court can be wrong in any decision, and any decision can have widespread effects on important national policies. The possibility of a wrong decision does not undermine the rule of res judicata; the remedy for a wrong decision is the right of appeal, not an unlimited opportunity to bring repetitious petitions. We hold, therefore, that a decision on a petition under section 10(*l*) is a final decision, for purposes of res judicata, on the narrow issue which it raises, and that doctrine is triggered by a section 10(*l*) decision whenever the usual criteria for its application are met. We shall now consider whether these criteria are met in this case.

---

7. Both *Baldovin* and *Mack* are currently on appeal to the Fifth Circuit. But the possibility remains that this court would, if it were to reach the merits of this appeal, view the issues differently from that court, so that the inconsistency between the regions would remain.

## II. The Preclusive Effect of the Baldovin Decision on this Case

Under the traditional rule of res judicata, a final judgment on the merits bars a subsequent suit on the same cause of action by the same parties and their privies. Under the rule of collateral estoppel, a judgment in a previous suit, whether on the same cause of action or not, bars relitigation of issues actually determined between the same parties. *Lawlor v. National Screen Service*, 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955). Therefore, to decide whether the Board's petition in this case is barred, we must ask

1) whether the *Baldovin* decision was "on the merits";

2) whether the parties here are the same as in that case;

3) whether the cause of action here is the same as there; and

4) if not, whether any issue decided in that case disposes of this case.

### A. "On the Merits"

The court in *Baldovin* never reached the substantive questions involved in the secondary boycott issue, since it found that the Board had no jurisdiction over the dispute. Generally, a decision on jurisdiction is not a decision "on the merits," as that term is usually used. However, *Baldovin* formally addressed the question of the Board's jurisdiction, not the court's jurisdiction. Since the Board's jurisdiction depends on whether the NLRA applies to the dispute, a finding of no jurisdiction in the Board is a finding that the statute does not apply—that is, that no violation of the NLRA has been alleged. It can be argued that such a decision is more akin to a decision "on the merits" than is the usual jurisdictional ruling.

■ Even if *Baldovin* is to be viewed as more comparable to a ruling on jurisdiction of the court, precedent indicates that the decision would stand as a bar to relitigation of the issue of jurisdiction. "The principles of res judicata apply to questions of jurisdiction as well as to other issues." *American Surety Co. v. Baldwin*, 287 U.S. 156, 166, 53 S.Ct. 98, 101, 77 L.Ed. 231 (1932) (constitutional claim in federal court barred by previous state court action in which due process challenge to jurisdiction was raised and rejected). *See also Durfee v. Duke*, 375 U.S. 106, 84 S.Ct. 242, 11 L.Ed.2d 186 (1963) (finding of jurisdictional facts by Nebraska court bars relitigation of same factual issues in Missouri court); *Angel v. Bullington*, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832 (1947) (diversity action in federal court barred by previous action dismissed by state court for lack of jurisdiction); *Jackson v. Irving Trust*, 311 U.S. 494, 61 S.Ct. 326, 85 L.Ed. 297 (1941) (collateral attack on judgment based on lack of jurisdiction barred by trial court's denial of motion to dismiss for lack of jurisdiction); *Stuhl v. Tauro*, 476 F.2d 233 (1st Cir. 1973) (dismissal for failure to raise a substantial federal question bars later action based on identical claim); *Boone v. Kurtz*, 617 F.2d 435 (5th Cir. 1980) (dismissal of complaint for lack of jurisdiction bars later "almost identical" complaint); 1B Moore's Federal Practice ¶ 0.405[5] at 655.

### B. Identity of Parties

#### 1. Petitioner

■ The named petitioner in *Baldovin* was Louis V. Baldovin, regional director of the 23rd region of the National Labor Relations Board, for and on behalf of the Board. Here, the named petitioner is Michael F. Walsh, acting regional director of the first region of the NLRB, also acting for and on behalf of the Board. The Board has not suggested that these two petitioners are anything but identical for purposes of res judicata, and we think it is clear that they are identical. *See Sunshine Anthracite Co. v. Adkins*, 310 U.S. 381, 402–03, 60 S.Ct. 907, 917, 84 L.Ed. 1263 (1940) ("A judgment in a suit between a party and a representative of the United States is res judicata in relitigation of the same issue between that party and another officer of the government").

The Board does raise a different and more substantial question concerning the identity of the petitioners in the two cases.

The Board points out that each petition arises from a charge by a different charging party. The Board emphasizes the charging party's substantial interest in the proceedings and suggests that the distinct interests of the separate charging parties negate the apparent identity of the petitioners in the two cases.

The party who files an unfair labor practice charge with the Board certainly does have an important interest in whatever proceedings result from the charge. In the usual case, the charging party is the one who is most hurt by the alleged violation and who has the most to gain from a remedy. These interests of the charging party receive recognition in the proceedings: under section 10(b), the Board may, in its discretion, permit the charging party (or any other person) to intervene in its proceedings. The Board does permit such intervention under its own regulations, 29 C.F.R. §§ 102.46 and 102.8 (1965). Once the Board has issued an order, the charging party may petition a court of appeals for review of that order as a "person aggrieved" under section 10(f). *Auto Workers v. Scofield*, 382 U.S. 205, 210, 86 S.Ct. 373, 377, 15 L.Ed.2d 272 (1965). If the Board seeks enforcement of its order in a court of appeals, the charging party may intervene. *Scofield, supra*. When the Board brings a petition under section 10(*l*), the charging party has a statutory right to "appear by counsel and present any relevant testimony," 29 U.S.C. § 160(*l*), although he may not intervene as a party,[8] *see, e. g., Hirsch v. Building & Construction Trades Council*, 530 F.2d 298, 307–08 (3d Cir. 1976); *Solien v. Miscellaneous Drivers & Helpers Union*, 440 F.2d 124, 130 (8th Cir.), *cert. denied*, 403 U.S. 905, 91 S.Ct. 2206, 29 L.Ed.2d 680 (1971); 3B Moore's Federal Practice ¶ 24.-06[3–8] at 24–132.

Nevertheless, we are not persuaded that the charging party's interest in a section 10(*l*) proceeding is so great that he should be considered the real petitioner for purposes of res judicata. Section 10(*l*) operates as a "narrow exception to the Norris–LaGuardia Act, 29 U.S.C. § 101, *et seq.*, which for the most part, deprived the federal courts of all power to issue a labor injunction." *Hirsch, supra*, 530 F.2d at 307. Congress has entrusted to the Board the sole right to initiate an action for a preliminary injunction under section 10(*l*); the charging party has no private right to seek injunctive relief. Congress provided that the Board may do so when it has "reasonable cause to believe" that a violation has occurred, 29 U.S.C. § 160(*l*), not simply whenever a charge has been filed. Congress intended section 10(*l*) to authorize the Board to act "in the public interest and not in the vindication of purely private rights," S.Rep.No.105, 80th Cong., 1st Sess., at 8, *quoted in Hirsch, supra*, 530 F.2d at 308, in order to prevent the widespread disruption of commerce that can result from such violations as secondary boycotts.[9] We therefore take literally the regional director's role as petitioner in section 10(*l*) proceedings, and we view the petitioner in each section 10(*l*) case as identical, regardless of the identity of the charging party.

Our conclusion is confirmed when we consider the results that would flow from our adoption of a contrary rule. In a case such as this one, where the underlying action that is alleged to violate the Act has wide-

---

8. We have permitted the charging party in this proceeding to file a brief *amicus curiae* in this court.

9. In *Auto Workers v. Scofield*, 382 U.S. 205, 220, 86 S.Ct. 373, 382, 15 L.Ed.2d 272 (1965), the Court observed with reference to unfair labor practice proceedings that "we think the statutory pattern of the Labor Act does not dichotomize 'public' as opposed to 'private' interests. Rather, the two interblend in the intricate statutory scheme." We do not think this language detracts from our conclusion here; we decline to separate the public and private interests at stake in section 10(*l*) proceedings so as to permit a separate proceeding to vindicate the private interests of a second charging party where the identical conduct charged has been considered in a previous section 10(*l*) petition brought by the Board. We note that the Court in *Scofield* allowed intervention by the charging party in part to prevent duplicate appeals. *Id.*, at 222 n.20, 86 S.Ct. at 384 n.20. The same consideration of avoiding duplication leads us to our conclusion here.

spread effects, any number of affected persons could bring charges with the Board. Here it was Allied that brought the charge; it could have been the stevedore, or the carrier, or Allied's customer, or all of these persons. A similar multitude of potential charging parties is created each time the ILA invokes its announced policy in reference to another ship or another cargo. None of these potential charging parties could initiate an action under section 10(*l*). But if were were to view each section 10(*l*) petition as raising the separate private interests of a single charging party, the Board could bring as many petitions as it had charges, regardless of the disposition of the previous petitions. Such repetitious petitions would place enormous burdens on the respondent and on the courts, while raising a danger of inconsistent decisions by the various district judges who would hear the petitions. We conclude that a petitioner in a section 10(*l*) proceeding is, both in form and in substance, the Board. The petitioners in this case and in the *Baldovin* case are therefore identical for purpose of res judicata.

2. Respondent

■ Under the traditional rules of res judicata, both plaintiff and defendant in the two actions had to be identical in order to meet the requirement of mutuality. *See*

*Blonder–Tongue v. University Foundation*, 402 U.S. 313, 317–26, 91 S.Ct. 1434, 1436–1441, 28 L.Ed.2d 788, discussing *Triplett v. Lowell*, 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949 (1936), and its predecessors. The rule of mutuality dictated that "unless both parties (or their privies) in a second action are bound by a judgment in a previous case, neither party (nor his privy) in the second action may use the prior judgment as determinative of an issue in the second action." *Blonder–Tongue, supra*, 402 U.S. at 320–21, 91 S.Ct. at 1439. In recent years, however, the rule of mutuality has been modified, if not completely abandoned. *Blonder–Tongue, supra*, and cases cited therein; *P. I. Enterprises, Inc. v. Cataldo*, 457 F.2d 1012 (1st Cir. 1972).

■ Thus, it may be unnecessary for us even to consider whether the respondents in this action are identical to those in *Baldovin*. But since the wisdom of the mutuality rule is still a subject of debate, we think it advisable to state that we have no doubt that mutuality is present here. Both in *Baldovin* and in this case, the Board named the International Longshoremen's Association, AFL–CIO, as a respondent. In each case, the Board also named one or more local subdivisions of the ILA.[10] But the injunction requested in *Baldovin* would have applied to the ILA nationwide, in every port;[11] had the injunction been grant-

10. In *Baldovin*, the South Atlantic & Gulf Coast District, ILA, and ILA Locals 872 and 1273 were also named. Here, ILA Local 799 is named.

11. The Board requested the following relief in *Baldovin*:

"1. That the Court issue an order directing Respondents to appear before this Court, at a time and placed fixed by the Court, and show cause, if any there be, why an injunction should not issue enjoining and restraining Respondents, their officers, representatives, agents, servants, employees, attorneys and all members and persons acting in concert or participation with them, pending the final disposition of the matters involved herein pending before the Board, from:

(a) Striking or threatening to strike at or in the vicinity of the premises of Cargill, Incorporated, or at or in the vicinity of the premises of any other person engaged in commerce, or in an industry affecting commerce, doing

business with TTT Stevedores of Texas, Inc.; TTT Ship Agencies, Inc.; Sovfracht Chartering Corporation; or any other person, the owners of the vessel BELGIUM or the owners of any other vessel at or in the vicinity of the Port of Houston, Texas, and in ports from Maine to Texas and Puerto Rico where International Longshoremen's Association, AFL–CIO, workers are employed.

(b) In any manner or by any means, including orders, directions, instructions, requests or appeals, however given, made or imparted, or by any like or related acts or conduct, or by permitting any such to remain in existence or effect, engaging in, or inducing or encouraging any individual employed by TTT Stevedores of Texas, Inc., or by any other person engaged in commerce or in an industry affecting commerce to engage in, a strike or refusal in the course of his employment to use, manufacture, process, transport or otherwise handle or work on any goods,

ed, therefore, the ILA local named here, as well as the local subdivisions named in *Baldovin*, would have been bound by it. The mutuality requirement, as stated in *Blonder–Tongue*, is therefore met.

#### C. *Identity of the Cause of Action*

█ The *Baldovin* case, the *Mack* case, and this case all arise out of a single general policy of the ILA against the handling of Soviet cargoes and Soviet ships. But in each case, the Board alleges facts regarding the refusal of a particular ILA local on a particular date to refer workers to a particular stevedore for the loading or unloading of particular goods on a particular ship. The Board argues that these factual distinctions make each case a separate cause of action, so that a decision in one case does not bar the others. In support of this proposition, the Board cites *Lawlor v. National Screen Service*, 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); *Kilgoar v. Colbert County Board of Education*, 578 F.2d 1033 (5th Cir. 1978); and our opinion in *Hadge v. Second General Savings & Loan*, 409 F.2d 1254 (1st Cir. 1969). The district court in Savannah accepted this reasoning in the *Mack* case, and it was on this ground that that court held the action not barred by the *Baldovin* decision.

We have serious doubts about the relevance of the cited cases to these facts. In each of those cases, a previous judgment was held not to bar an action based on conduct of the same nature as that originally alleged. But in each case, the subsequent conduct was broader and more far-reaching than the conduct which led to the original complaint. Here, there is no broadening of the pattern of conduct. Rather, the conduct in each instance is the same; each ILA local simply follows the announced policy of the national union when it is asked to work on Soviet cargo. To be sure, the particular application of union policy involved in this case had not occurred at the time of the *Baldovin* suit, and it had not therefore given rise to a cause of action which could have been sued on at that time. But the ILA's policy was announced on January 8, 1980, well before the instigation of the *Baldovin* suit. In *Baldovin*, the Board sought to enjoin that policy and all conduct in furtherance of it. We think, therefore, that it was that policy, and the resulting pattern of such conduct, which gave rise to the cause of action in *Baldovin*, and again in this case.

But whether the cause of action is the same in the two cases or not, this case is barred under the rule of collateral estoppel if the issue decided there is dispositive here.

articles, materials or commodities or to perform any service, or in any manner or by any means threatening, coercing or restraining TTT Stevedores of Texas, Inc. or any other person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is to force or require TTT Stevedores of Texas, Inc. or any other person, to cease doing business with Sovfracht Chartering Corporation, or any other person; and/or to force or require TTT Stevedores of Texas, Inc., or any other person, to cease using, selling, handling, transporting or otherwise dealing in the products of Cargill, Incorporated, and/or the Soviet Union, or any other person, or to cease doing business with Cargill, Incorporated, or any other person; and/or to force or require Cargill, Incorporated, to cease doing business with the Soviet Union and/or with TTT Stevedores of Texas, Inc.; TTT Ship Agencies, Inc.; or any other person, or with the owners of the BELGIUM, or the owners of any other vessel; and/or to force or require TTT Ship Agencies, Inc., to

cease doing business with Sovfracht Chartering Corporation or with the owners of the BELGIUM, or with the owners of any other vessel; and/or to force or require Cargill, Incorporated; TTT Stevedores of Texas, Inc.; TTT Ship Agencies, Inc.; or any other person; the owners of the BELGIUM or the owners of any other vessel to cease using, selling, handling, transporting or otherwise dealing in the products marketed, distributed and sold by members of Kansas Farm Bureau, Texas Farm Bureau and American Farm Bureau Federation, or to cease doing business with members of Kansas Farm Bureau, Texas Farm Bureau and American Farm Bureau Federation, all in furtherance of their boycott of grain intended for export to the USSR.

2. That upon return of said order to show cause, the Court issue an order enjoining and restraining Respondents in the manner set forth above.

3. That the Court grant such further and other relief as may be just and proper."

Accordingly, we move on to consider the application of collateral estoppel.

### D. Collateral Estoppel

██ The district court in *Baldovin* denied the Board's petition on the ground that the Board lacked jurisdiction over the dispute because the dispute was not "in commerce." In this case, the district court was again required to address the threshold issue of the Board's jurisdiction. If the jurisdictional questions in the two cases are the same, then the question presented here was litigated and decided against the Board in *Baldovin*, and relitigation of the issue is barred by collateral estoppel.

The Board urges, however, that the jurisdictional issue here is not the same as in *Baldovin* because the particular ship involved here is of United States registry, while the particular ship involved there was foreign. The Board seeks to characterize this distinction as one of "controlling fact," citing *Commissioner v. Sunnen, supra,* 333 U.S. at 599–601, 68 S.Ct. at 720–721, so as to escape the operation of collateral estoppel.

We have no doubt that collateral estoppel applies only where the "controlling facts" are unchanged. But we do not think that the nation of registry of the particular ship involved is a "controlling fact" under these circumstances. The district court opinion in *Baldovin* is quite brief and offers little elaboration of the court's reasoning. We must therefore look beyond that opinion to discern which facts were controlling in that case.

We look first to the cases relied on by the *Baldovin* court, *Windward Shipping v. American Radio Association,* 415 U.S. 104, 94 S.Ct. 959, 39 L.Ed.2d 195 (1974); *American Radio Association v. Mobile Steamship Association,* 419 U.S. 215, 95 S.Ct. 409, 42 L.Ed.2d 399 (1974); and *National Maritime Union v. Shippers Stevedoring,* 245 NLRB 29 (decided by the Board on September 21, 1979). *Windward Shipping* and *Mobile* both involved picketing of foreign ships by American unions in protest of the working conditions of the foreign crews aboard those ships. The Supreme Court, focusing on the primary disputes–the labor disputes between the foreign ships and their crews– held that the Board lacked jurisdiction over the matters because they were not "in commerce"; state court injunctions against the picketing were therefore not preempted by the NLRA. In *Mobile,* the Court expressly rejected a "bifurcated view" which could distinguish the effects of the picketing activity–an alleged secondary dispute–from the underlying primary dispute which gave rise to the picketing. In *Shippers Stevedoring,* the board adopted a decision by the Administrative Law Judge which expressed the view that, under these cases, the Board lacked jurisdiction over picketing by an American union of a Soviet ship in protest of that ship's carrying of goods financed by United States government contracts.[12]

It is true that each of these cases involved ships of foreign registry. In *Windward* and *Mobile,* the registry of the ship, along with the domicile of the workers involved, brought the labor dispute outside the bounds of United States commerce. But involvement of a foreign ship does not always deprive the Board of jurisdiction. For example, the Supreme Court has allowed jurisdiction in the Board over the picketing by an American union of a foreign ship where the underlying dispute concerned the wages and working conditions of American longshoremen. *ILA Local 1416 v. Ariadne,* 397 U.S. 195, 90 S.Ct. 872, 25 L.Ed.2d 218 (1970). We think these cases indicate that the question of jurisdiction turns not on the registry of the ships, but on the nature and location of the underlying dispute.[13]

---

**12.** The order in *Shippers Stevedoring* appears to be based on a finding that no violation of the Act had occurred. But the ALJ's decision, which the Board adopted, discusses the jurisdictional issue at great length and expresses the view that no jurisdiction existed, even though it goes on to observe that the jurisdictional question need not actually be decided.

**13.** We note that Justice Stewart, in his dissent in *Mobile,* interpreted the majority's decision in this way. The majority responded by disavow-

We look also to the record in the *Baldovin* case and particularly to the position that the Board took in that case. As we noted in Part II, B, *supra*, the Board there sought an injunction against the ILA's nationwide policy and against all ILA activity, in every port, in furtherance of that policy. The requested relief made no distinction between United States and foreign ships. In denying the requested injunction, the *Baldovin* court refused to enjoin activity related to any ship, foreign or domestic. Since that court denied the injunction on solely jurisdictional grounds, we may assume that it intended its jurisdictional decision to apply to the whole dispute, not just those specific instances of ILA action related to foreign ships. Otherwise, the *Baldovin* court could have issued an injunction applicable to ILA action in regard to United States ships.

The results would be anomalous if we were to adopt the contrary view that the Board urges upon us. If we interpret the *Baldovin* ruling as applicable only to foreign ships, we must then address the question of jurisdiction in relation to the particular facts before us where a ship of United States registry is involved. If we were then to find jurisdiction in the Board and reverse the district court on the merits, the district court would be free to issue an injunction against the ILA's action, but that injunction could apply only to actions related to United States ships. The ILA would remain free to refuse to handle Soviet cargo carried by foreign ships, despite the impact of that action on American stevedores and importers and on the flow of goods in and out of the United States. But it would be enjoined from taking the same action when the ships were American, even though the effect of that action on United States commerce would be the same. We think it unlikely that the *Baldovin* court intended to limit its ruling in such a way as to permit that result. In our view, there-

fore, the *Baldovin* decision settled the issue of the Board's jurisdiction over the ILA's policy with regard to Russian cargoes, and over all union activity in furtherance of that policy. We need not, and do not, comment on the correctness of the *Baldovin* court's ruling on jurisdiction. Our holding here is limited to an interpretation of the scope of that ruling in relation to this case.

E. *Equity*

■ The doctrine of res judicata is an equitable one, and a court is not bound to give res judicata effect to a previous judgment if an inequitable situation would thereby result. *See Sweetheart Plastics v. Illinois Tool Works*, 439 F.2d 871 (1st Cir. 1971); 1B Moore's Federal Practice ¶ 0.405[12] at 787. The Board argues that such inequity would result here, since the charging party in this particular case would be denied the benefit of injunctive relief against activity which has severely injured him, without having had the opportunity to exercise his statutory right to appear and present testimony. We have discussed the role of the charging party in Part II, B, *supra*, and need not repeat that discussion here. We point out that since the facts here are undisputed, loss of the right to appear and present testimony is not likely to have caused harm. The issue here is easily posed and remains the same regardless of the identity of the charging party and the geographical area affected. We see no equitable obstacle to the application of collateral estoppel as a bar to this action.

*Vacated and remanded with instructions that the petition be dismissed on the ground of res judicata.*

---

ing any intention to disapprove those circuit court cases that had allowed Board jurisdiction over secondary boycotts where the primary dispute was outside the United States. *Id.*, 419 U.S. at 225 n.10, 95 S.Ct. at 415 n.10. But the

majority also suggested quite strongly, in the text of its opinion at 226, that the Board could not exercise jurisdiction over a secondary boycott where the primary dispute was outside its jurisdiction.