**Nancy ALEJO JIMENEZ, Plaintiff,**

v.

**Dr. Eduardo HEYLIGER, Seguros Triple S, Inc., Defendants.**

**Civ. No. 88–2028 GG.**

United States District Court,
D. Puerto Rico.

Feb. 14, 1992.

Raul Davila Rivera, Bauza & Davila, Old San Juan, P.R., for plaintiff.

Nelson Rivera Cabrera, Hato Rey, P.R., for defendants.

## OPINION AND ORDER

GIERBOLINI, Chief Judge.

This is a medical malpractice case filed by Dr. Nancy Alejo Jiménez, a dentist born in the Dominican Republic against Dr. Eduardo Heyliger, a gynecologist. Plaintiff claims that defendant was negligent when he performed on her a hysterectomy. She alleges that due to defendant's negligence a vesicovaginal fistula was formed which caused her to discharge urine through the vagina rather than by the urethra. The case was tried before a jury and lasted four days. As is customary, the jury was instructed during the preliminary instructions and at other times that they were not to discuss the case among themselves or with any other person until the case was finally submitted to them for consideration after the court's instructions as to the applicable law.

During the formal charge the jury was instructed again that they could not communicate with any one except the court, and all such communications should be in writing.

After the formal charge Mr. Edwin Ayala Diaz, a Court Security Officer (CSO), provided by the United States Marshal Service, was sworn in to take charge of the jury. Some time after the jury started deliberations, the court was informed that the CSO had, upon request by the jury, brought into the jury room, without permission of the court, a drawing made by defendant's expert, Dr. Juan Figueroa during his direct examination. We ordered the immediate removal of the drawing from the jury room and informed the attorneys for the parties of what had transpired.

In due course the jury rendered a verdict for defendant. After the jury was discharged, new information regarding possible jury misconduct came to light. We called the attorneys for both sides and informed them that a hearing regarding the new information would be held the next day.

Two witnesses testified under oath at the hearing, Mr. Edwin Ayala Díaz, the CSO in charge of the jury, and Mr. Boabdil Vazquetelles, the court reporter. Mr. Ayala Díaz testified that he had little experience as a CSO. He joined the CSO group while we were still at the Old San Juan courthouse, but soon thereafter his military unit was sent to the Persian Gulf. Upon his return, he rejoined the CSO service. He had received no training as to what to do with a jury. As a result of his ignorance in handling a jury, he entered the jury room and stayed there during their deliberations. He initially stated that he only stayed there for ten minutes but from other information received by this court, we conclude that he stayed there for an extended period of time, longer than that testified to by the CSO. Mr. Vazquetelles testified that he had been waiting in the court room for the deliberations to terminate. Vazquetelles then went to check for communications from the jury. Having had Vazquetelles as this court's reporter for the last twelve years, this judge knows that he would not have checked for messages from the jury only ten minutes into its deliberations. Vazquetelles testified that he: looked for the CSO in the area where the CSO normally is but couldn't find him; continued to look for the CSO by walking to the area near the judge's chambers; walked out to the hallway; walked to the area in front of the courtroom; went back to the courtroom; went through the court; returned to the area near the jury room; went into the judge's chambers and inquired of the court room deputy as to the whereabouts of the CSO; went back outside and spoke to another CSO; returned to the chambers and spoke with the court room deputy again; communicated the aforementioned facts to this judge; went to the jury room and knocked on the door; and finally found Ayala Díaz, the CSO in question, out in the front area. This lengthy sequence of events Vazquetelles described in his testimony establishes, and we so find, that the period of time the CSO

spent inside the jury room was much longer than the ten minutes he testified to.

Ayala Díaz testified that during his stay inside the jury room he could hear the jury deliberations, and at one point the jury requested he bring them the two charts made by the experts of each party. He returned to the courtroom and brought back to the jury room a drawing by defendant's expert which was done on paper. He testified that he was unable to bring into the jury room the other drawing, which had been made by plaintiff's expert on a mobile blackboard. The CSO testified that he did not inform the court of the jury's request and of his action, bringing in only one drawing and failing to bring in the second one. As an excuse for the latter he stated that the blackboard was bulky and he could not handle it by himself.

At some point Ayala Díaz heard someone knocking at the jury room, and when he opened the door another CSO informed him that Mr. Vazquetelles, the court reporter, was looking for him. He went out of the jury room and Mr. Vazquetelles informed him that he could not be inside the jury room. Vazquetelles further informed Ayala Díaz that all jury requests must be in writing and brought to the judge's attention. These were all instructions given to the jury during their formal charge by this court. Mr. Ayala Díaz testified that he then informed Mr. Vazquetelles that he had brought the defense's drawing inside the jury room. Ayala Díaz testified that he never informed this judge nor any members of this judge's staff until after the jury's verdict, that the jury had requested two charts and that he brought in only the defense's drawing.

Mr. Vazquetelles testified as to another incident involving alternate juror, Margarita Rotger. The four day trial was split by a weekend. The jury was not sequestered for the trial. However, they were instructed on several occasions during trial that they were not to discuss any aspect of the case with anyone, including fellow jurors, until they began formal deliberation at the trial's end. Mr. Vazquetelles stated that on Saturday afternoon, November 15, 1991,

he inadvertently ran into alternate juror Rotger at a consumer exhibition at the Roberto Clemente Coliseum. Vazquetelles testified that although he did not initiate conversation on the subject, alternate juror Rotger made the following comments concerning the trial to him and his daughter,

> Boy, what a case. You know, it's funny, when we—we asked ourselves why is this case in the federal court, and I said, "She's got to be Dominican. She looks Dominican." And when she stated that she was Dominican, I started to laugh ... because I was right in what I said. And it seems to me that she is a "buscona." (Transcript of Nov. 20, 1991 hearing, pp. 22–23).

The certified court interpreter Marie Hernández translated the Spanish word "buscona" as follows:

> Well, the Spanish word "buscona" would have different connotations. It goes from just a plain money searcher, money seeker, to the connotation of street walker. It has a variety of ranges.... Including hustler in the term of hustler or prostitute. That is the dictionary sense. (Addendum to Transcript of Nov. 20, 1991 hearing, p. 2).

Vazquetelles further testified as to another statement Rotger made to him:

> Q Did she [Rotger] make any additional comments about the case or the plaintiff?
> A Well, that about the plaintiff, that she was a "buscona" and—oh, yes, about this thing about her having several abortions at the age of 15. She just made faces, you know, concerning that.
> THE COURT: I didn't get that.
> THE WITNESS: She [Rotger] says, "And this thing about her [plaintiff], you know, having these abortions at the age of 15," she made those facial gestures going like this (indicating). (Transcript of Nov. 20, 1991 hearing, pp. 23–24.)

## Analysis

For the reasons stated below we find that refusal to set aside the verdict and order a new trial would be inconsistent with substantial justice. The irregularities

in jury deliberation, probable jury bias based on national origin, and failure of the court to give a curative instruction to a highly prejudicial remark defense counsel made in his closing arguments to the jury, are errors too substantial to be characterized as harmless under Federal Rule of Civil Procedure 61.

Federal Rule of Civil Procedure 59(a)(1) states that a new trial may be granted in a jury trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." The rule is broadly stated to avoid having to list all possible grounds for granting a new trial, but general grounds include, "... that for other reasons the trial was not fair, and that the motion may also raise questions of law arising out of substantial errors in the admission or rejection of evidence or the giving or refusal of instructions ... The court has the power and duty to order a new trial whenever, in its judgment, this action is required in order to prevent injustice." 11 Wright & Miller, *Federal Practice and Procedure: Civil* § 2803, pp. 37–38 (1973). The decision to grant a new trial ultimately rests within the sound discretion of the trial court, and appellate review is limited to "abuse of discretion." *Dumas v. Maclean,* 404 F.2d 1062, 1065 (1st Cir.1968), *Globe Liquor Co. v. San Roman,* 332 U.S. 571, 68 S.Ct. 246, 92 L.Ed. 177 (1948), *Nimrod v. Sylvester,* 369 F.2d 870 (1st Cir.1966), *See generally* 11 Wright & Miller, *Federal Practice and Procedure: Civil* §§ 2803, 2818, pp. 31–33, 119 (1973).

The jury deliberations in this case were conducted under less than model laboratory conditions. Due process does not mean an errorless trial but it does mean "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips,* 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982). Serious irregularities came to light after the verdict had been rendered, thus making it impossible for counsel to interpose a proper objection.

■ If there are serious allegations of prejudicial jury misconduct, then the party alleging improper influence does not have to show by a "positive finding that the jury was actually influenced by what took place; but rather involves a determination as to whether or not it was reasonably certain that they were not." *Southern Pacific Company v. Francois,* 411 F.2d 778, 780 (5th Cir.1969). We will examine individually the three separate incidents. Any of the three incidents would be sufficient by itself to grant plaintiff's motion for new trial, but when taken together compel such relief.

### Irregularities in Jury Deliberation Process

There are at least three errors which took place during the process of deliberation:

A) presence of security officer in jury room during deliberations and the fact that he could hear the deliberations with no written record of what transpired or the length of time he was in jury room;

B) ex parte communication between security officer and the jury when they requested the two drawings, a request of which the court was not informed at the time, in violation of explicit jury instructions to place all communications in writing;

C) unauthorized introduction of information into the deliberative process not formally admitted into evidence, the drawing, which supported defense contentions of non-negligence, while keeping out information favorable to the plaintiff which was also requested by the jury.

■ Jury deliberations must be conducted in secret and jurors generally may not testify as to statements made during the course of their deliberation. 11 Wright & Miller, *Federal Practice and Procedure: Civil* § 2810, p. 72 (1973). The fact that the security officer was in the jury room during deliberations, even assuming arguendo that he did not initiate conversation while there, may still have affected the

deliberations if just through his presence he intimidated jurors from speaking frankly among themselves. *See also Liggett & Myers Tobacco Co. v. Imbraguglia,* 73 F.Supp. 909 (D.Md.1947).

In this case there was at least one oral undocumented ex- parte communication between the jury and the security officer, the request for the two drawings, which became known to the judge and the parties after the verdict had been rendered. Our circuit has recently outlined four steps which constitute the preferred procedure for handling a jury message:

(1) the jury's communique should be reduced to writing; (2) the note should be marked as an exhibit for identification; (3) it should be shown, or read fully, to counsel; and (4) counsel should be given an opportunity to suggest an appropriate rejoinder. *United States v. Maraj,* 947 F.2d 520, 525 (1st Cir.1991).

In this case none of the four steps were taken since this oral communication was never reduced to writing or marked as an exhibit, and counsel did not even know of its existence, much less have a chance to respond to it. Our circuit has further delineated the importance of counsel being able to timely respond to such communications, "*Maraj,* then, stands foursquare for the proposition that messages from a deliberating jury, pertaining to ongoing deliberations, ought to be fully disclosed to the lawyers when received, so that the latter may be heard before the judge implements a course of action." *United States v. Parent,* 954 F.2d 23, 25 (1st Cir.1992).

Not all errors in handling jury communications require that a new trial be granted, but we conclude like the *Parent* court did that the error in this case is not harmless. In *Parent,* the First Circuit found reversible error where the judge upon receiving a written jury request for a copy of a jury instruction sent in the written instruction without informing counsel of the jury request until after the verdict had been rendered. *United States v. Parent,* 954 F.2d at 24. Although our Circuit found that the written instruction the judge sent in was an accurate statement of the law, and that the

substance of the instruction contained no new information, they still found this to be reversible error requiring a new trial since,

[T]he real harm is not that the trial judge might have misstated the law ... but that the aggrieved party will have lost the value of the chance: the opportunity to convince the judge that some other or different response would be more appropriate, the circumstances considered ... This case is a paradigmatic example of the point; it is entirely plausible that defense counsel, if seasonably apprised, might successfully have prevailed upon the district court to withhold the written version ... Being kept in the dark, defense counsel was powerless to prime the pump of persuasion. *Parent* 91–1168 at 7 [954 F.2d at 25].

Plaintiff here was likewise denied her ability to persuade this court that the defense drawing should have been kept out or that both drawings should have been before the jury. Since these two drawings went to a hotly disputed area of contention on a material issue, whether Dr. Heyliger was medically negligent in his suturing of plaintiff during the hysterectomy, we can not say that plaintiff's inability to timely argue her position on the jury's request for the drawings was harmless error.

Other circuit courts dealing with the issue of ex parte communications with jurors have also found that a new trial may be necessary to cure the improper influence. *Petrycki v. Youngstown & Northern R. Co.,* 531 F.2d 1363, 1368 (6th Cir.1976) (ex parte contact between judge and jury raises presumption of reversible error), *Standard Alliance Industries, Inc. v. Black Clawson Co.,* 587 F.2d 813, 828–829 (6th Cir.1978) (ex parte contact between law clerk and jurors was reversible error), *Thomas v. Peerless Mattress Co.,* 284 F.2d 721 (4th Cir.1960) (new trial proper when deputy marshall gave ex parte response to legal question posed by jury foreman). *See also Parker v. Gladden,* 385 U.S. 363, 87 S.Ct. 468, 471, 17 L.Ed.2d 420 (1966). Factors these courts considered important when they decided to grant a new trial were:

—length and nature of ex parte contact with jury was unknown;

—no record of ex parte contact was kept; and

—no notice of the ex parte contact was given to the parties.

*Standard Alliance* 587 F.2d at 828–829, and *Peerless Mattress* 284 F.2d at 722. These factors are also relevant in the case at bar and militate in favor of granting a new trial. We find persuasive the analysis of *Peerless Mattress* and adopt it by reference.

> During their consultation, jurors should be protected from misleading instructions and extraneous influence. To provide such protection, their requests for additional instructions should be addressed to the court and should be answered, if at all, by the trial judge in open court in the presence of the parties and their counsel. When a deputy marshall in charge of the jury undertakes to answer such an inquiry, he injects the contaminating influence his presence is intended to prevent. Unless such an improper communication by a deputy marshall is harmless, its effect should be dissipated. When it becomes known after the jury has been discharged, the only available remedy is a new trial. *Peerless Mattress* 284 F.2d at 722 (internal footnote and citations omitted).

Since there was no notification to the judge or parties of the details of this ex parte communication between the security officer and the jury prior to the jury's verdict being received, there was no chance to cure its improper influence. Applying the factors other courts have found relevant, we conclude that the presumption of prejudicial error, arising out of the ex parte communications between Ayala Díaz and the jury for the time period he was with them during deliberations, has not been rebutted and a new trial is necessary to correct such error.

■ The second major error during deliberations was that the officer unilaterally decided to bring into the jury room only the drawing favorable to the defendant and not the one favorable to plaintiff, despite the jury's request for both. As stated before, neither of the two drawings had been marked as exhibits.

The drawing by Dr. Bernard Nathanson, plaintiff's expert, attempted to show how the improper placing of a suture against the plaintiff's bladder wall during the course of the operation could cause bladder tissue to die and slough off and thus result in the creation of a vesicovaginal fistula, the medical condition the plaintiff alleged was caused by Dr. Eduardo Heyliger's medical negligence.

Dr. Juan Figueroa, defendant's expert, tried to demonstrate through his drawing of a hypothetical suture of the bladder wall, how it would be impossible to place a suture during surgery the way Dr. Nathanson had speculated Dr. Heyliger had done, and not notice the mistake since the improper placing of a suture would produce a stump of almost an inch thick.

The jury was confronted with a classic "battle of the experts" who had testified as to two irreconcilable theories of whether Dr. Heyliger was medically negligent in the manner in which he placed sutures during the course of plaintiff's hysterectomy. Both experts did visual depictions of their conflicting theories as to whether or not sutures could have engaged the bladder wall in the manner alleged by plaintiff to have caused her medical injuries.

Despite the jury request that both of these visual depictions of the respective theories regarding medical negligence be in their possession during deliberations, the security officer brought in only the defendant's. The improper presence of the defendant's drawing within the jury room while the plaintiff's drawing was left outside had a deleterious effect on the jury's ability to properly evaluate the respective theories for and against medical negligence, and must be considered grounds for a new trial.

### *Probable Jury Bias Based on National Origin*

■ The incident involving ex parte communications between alternate juror

Margarita Rotger and court reporter Boabdil Vazquetelles, Jr., regarding the plaintiff's national origin, is an additional ground for setting aside the verdict and granting a new trial. The general rule against allowing jurors to impeach their own verdict is inapplicable here, since this is not testimony by a juror as to what went on in the jury room, but rather testimony by a third party as to statements an alternate juror made to him in a non judicial setting during the trial. *See generally Reich v. Thompson*, 346 Mo. 577, 142 S.W.2d 486 (1940) (rule that juror can not impeach verdict does not operate to exclude testimony of outsider who overheard what a juror said). Another exception to the general rule against jurors impeaching their verdicts, are in cases where allegations are raised that a juror may have answered falsely on voir dire about a matter of potential bias or prejudice. *Dept. of Public Works and Bldgs. v. Christensen*, 25 Ill.2d 273, 184 N.E.2d 884 (1962).

The jurors and alternate jurors in this case were instructed on numerous occasions during trial that they were not to discuss any aspect of the case among themselves or with anyone else prior to the beginning of formal deliberations. Yet despite clear jury instructions to the contrary, alternate juror Rotger volunteered information concerning the trial to Vazquetelles and his daughter in a public place, a coliseum. This court can safely assume that if the alternate juror publicly volunteered information as to her opinion of the plaintiff's moral character; made comments on evidence previously submitted accompanied by facial gestures indicating her opinion of such evidence; and made comments regarding the plaintiff's national origin to a member of this judge's staff; that she also voiced such opinions to other jurors in violation of our orders.

The alternate juror's own statement confirms this inference, "You know, it's funny, when we—**we asked ourselves** why is this case in the federal court, and I said, 'She's got to be Dominican. She looks Dominican." (Transcript of Nov. 20, 1991 hearing, pp. 22–23) (italics added). The use of "we" and "ourselves" clearly indicates that juror Rotger discussed her impressions with the other jurors prior to the beginning of deliberations; another violation of this court's jury instructions. We find that alternate juror Rotger's open statements expressed probable bias against the plaintiff because of her national origin as a citizen of the Dominican Republic. The jury was thus infected with such bias. Under these circumstances the jury verdict cannot stand.

Juries necessarily act as a unit and the misconduct of any juror, actual or implied, which forestalls or prevents a fair and proper consideration of the evidence presented in a case, is misconduct of the entire jury, vitiating their verdict and requiring a new trial. *Mathisen v. Norton*, 187 Wash. 240, 60 P.2d 1 (1936). Courts have noted that the statement of an alternate juror to a regular juror prior to the start of deliberations may affect the jury's deliberations in a prejudicial manner, *Weathers v. Kaiser Foundation Hospitals*, 5 Cal.3d 98, 95 Cal.Rptr. 516, 521–22, 485 P.2d 1132, 1137–38 (1971); and that statements made to an alternate juror by an outside party may also prejudice a jury's verdict, *Parker v. Gladden*, 87 S.Ct. at 471 (1966) (" '[I]t would be blinking reality not to recognize the extreme prejudice inherent' in such statements that reached at least three members of the jury and **one alternate member**.") (italics added).

On voir dire, juror Rotger was asked if there was any reason why she would be unable to render an impartial verdict in this case unaffected by bias or prejudice and solely on the evidence presented, and by her silence in response to such question answered no. *Mathisen v. Norton*, 187 Wash. 240, 60 P.2d 1 (1936) (grant of new trial not abuse of discretion where juror failed to disclose bias against party on voir dire in response to general questions concerning potential prejudice or impartiality). Concealment of possible bias during voir dire can be sufficient to impair a party's right to exercise peremptory challenges as noted by the Sixth Circuit,

[T]he Constitution guarantees litigants in a civil case a fair and impartial tribunal, free from actual bias or prejudice. Con-

sequently, a showing of juror bias is the touchstone to determine whether to grant a new trial,.... "The bias of a prospective juror may be actual or implied, that is, it may be bias in fact or bias conclusively presumed as a matter of law." ... Applying these principles, we hold that a new trial must be granted where the undisclosed information would have resulted in the juror's disqualification for cause. This occurs when either the juror admits a feeling of partiality or "the judge makes a pragmatic judgment that there is a substantial possibility of the juror unconsciously favoring one side or another". We also hold that a district judge shall presume bias, and grant a new trial, when a juror deliberately concealed information or gave a purposefully incorrect answer. *McCoy v. Goldston,* 652 F.2d 654, 659 (6th Cir.1981) (internal citations omitted). *See also Weathers,* 95 Cal.Rptr. at 524, 485 P.2d at 1140.

Leaving aside the issue of whether this was deliberate or purposeful concealment by the alternate juror, we find it evident from the statements disclosed that there is a substantial possibility Rotger was unable to put aside her feelings towards the plaintiff and impartially evaluate the evidence in the case.

In a related vein, the Eleventh Circuit noted while reversing a district court's failure to grant a new trial despite juror comments regarding the defendant's ethnic origin and religion,

> The obvious difficulty with prejudice in a judicial context is that it prevents the impartial decision-making that both the Sixth Amendment and fundamental fair play require. A racially or religiously biased individual harbors certain negative stereotypes which, despite his protestations to the contrary, may well prevent him or her from making decisions based solely on the facts and law that our jury system requires. *United States v. Heller,* 785 F.2d 1524, 1527 (11th Cir. 1986).

We find the sentiments expressed by the Eleventh Circuit concerning the effect of racial and religious prejudice on jury impar-

tiality and public perception of the judicial system, equally applicable when dealing with prejudice based on national origin. The issue of plaintiff's national origin is totally extraneous to the nature of the alleged malpractice claim here, and the fact that the subject of plaintiff's national origin was even introduced into the judicial mix by the alternate juror after she viewed the plaintiff's physical appearance, strongly suggests that Rotger was unable to be objective towards a plaintiff of Dominican descent.

This is especially true when coupled with her comment that, "it seems to me that she [the defendant] is a buscona," which the certified court interpreter translated as "plain money searcher, money seeker, ... street walker ... hustler or prostitute." Since there was no evidence introduced or anything in the trial record that could lead an objective juror to draw such conclusions regarding the plaintiff, her remarks clearly demonstrate Rotger's bias against the plaintiff and her inability to objectively evaluate the evidence presented. Further bias against plaintiff is shown from Rotger's disparaging comments on the evidence introduced at trial concerning plaintiff's two spontaneous abortions, accompanied by Rotger's facial expressions indicating disapproval.

A party seeking a new trial does not need to prove beyond a reasonable doubt that the extraneous influence conclusively effected the jury verdict, since some sorts of jury misconduct are presumed prejudicial and a rebuttable presumption of prejudice arises in support of the movant. *McLain v. General Motors Corp.,* 586 A.2d 647, 654 (Del.Super.Ct.1988). Where there is a strong possibility that extraneous prejudicial influences may have tainted the integrity of the jury verdict, courts require not a "positive finding that the jury was actually influenced by what took place; but rather ... a determination as to whether or not it was reasonably certain that they were not." *Southern Pacific,* 411 F.2d at 780.

One court noted in a case where a juror expressed probable religious bias against a Jewish defendant,

> There seems to be little doubt that at least one person on that jury was affected, and it seems prejudicially so and it makes little difference that the infection was only slight so long as it is present ... [The] deliberations ... should be free of taint of passion, prejudice, or mistake ... If the trial judge found even one juror was so biased as to prevent him or her from objectively weighing the evidence, it was sufficient to set the verdict aside. *New Jersey v. Levitt*, [36 N.J. 266] 176 A.2d 465 (N.J.1961).

We find that the jury's verdict was infected with the national origin bias exhibited by alternate juror Rotger such that the verdict must be set aside and a new trial granted.

### Defense Counsel's Prejudicial Remarks During Closing Arguments

█ The final ground for reversing the jury verdict and granting a new trial arises out of a highly prejudicial remark defense counsel Nelson Rivera Cabrera made during his closing arguments. This remark was timely objected to by plaintiff's counsel but was not raised in plaintiff's brief in support of her motion for a new trial. We are not constrained to discuss only the questions briefed by the parties. *Walsh v. International Longshoremen's Association, Local 799*, 630 F.2d 864, 867 (1st Cir.1980) (Appellate court *sua sponte* raised the issue of res judicata which was not briefed on appeal but had been argued below).

█ Law of the case principles generally constrain trial courts from reconsidering matters once decided during the course of a suit, but it is clear that federal courts retain the power to reconsider such issues if they wish. *See generally* 18 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 4478, pp. 788–790 (1981) (*quoting* Justice Holmes in *Messinger v. Anderson*, 225 U.S. 436, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912), "[L]aw of the case doctrine 'merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power.' "). Major grounds justifying reconsideration include the need to correct a clear error or to prevent manifest injustice, *Id.* at 790. We find both factors relevant to the case at bar.

Defense attorney Mr. Rivera Cabrera stated that the evidence the jury had heard during the four days of trial clearly demonstrated that the plaintiff in this case was a "precocious and promiscuous young woman." This remark was timely objected to by plaintiff's counsel who properly alleged that there was no evidence at all in the record that plaintiff was promiscuous.

█ We find that plaintiff was correct. Promiscuity had never been mentioned in the trial up to that point, and was not an issue or a fact in controversy in the case. Upon the plaintiff's attorney's timely objection, the proper procedure for this court when confronted with defense counsel's highly prejudicial collateral remark should have been to admonish and chastise the defense attorney for his remark, strike it from the record; and instruct the jury that they must totally disregard that remark, give it no credence and that they were forbidden from considering it in any way or manner in reaching a verdict. Instead this court mistakenly stated to the jury that whether or not the plaintiff was promiscuous was a question of fact to be decided by them. Plaintiff's attorney did not move for reconsideration of my ruling or offer a curative instruction, but we are of the opinion that a court has the authority to recognize its own errors *sua sponte* and the power to correct them once recognized.

The undersigned's action placed in the hands of the jury a highly charged and prejudicial issue that had never been in contention. Considered in conjunction with the alternate juror's use of the word "buscona" with its connotations as a "prostitute" or "hustler", and the alternate juror's comment on the evidence concerning abortion and accompanying facial expressions, defense attorney's remark must have taken on added significance in the minds of the jurors. This was "plain error" by the court

and would by itself have been grounds for granting a new trial, even without the timely objection of plaintiff's counsel. *See generally Sibbach v. Wilson & Co.*, 312 U.S. 1, 61 S.Ct. 422, 427, 85 L.Ed. 479 (1941) (Supreme Court properly considered issue not assigned as error before either Circuit Court of Appeals or Supreme Court, where mistake was a "plain error of such a fundamental nature that we [Supreme Court] should notice it.") (internal footnote omitted), *Codex Corp. v. Milgo Electronic Corp.*, 717 F.2d 622, 629 (1st Cir.1983), *De Vasto v. Faherty*, 658 F.2d 859, 864 (1st Cir.1981), and *Bestway Equipment Services, Inc. v. Berwind Lines, Inc.*, 655 F.2d 440, 443–444 (1st Cir.1981).

Other circuit courts considering similar issues have noted the irrelevancy but highly prejudicial effect of interjecting charges of "promiscuity" into a trial,

"[A]bsent circumstances which enhance its probative value, evidence of a rape victim's unchastity ... is ordinarily insufficiently probative either of her general credibility as a witness or of her consent to intercourse with the defendant on the particular occasion charged to outweigh its **highly prejudicial effect** ... It is obvious that the mere fact of **unchastity** of a victim has no relevance whatsoever to her credibility as a witness. Such a proposition would 'necessarily imply the absurd [corollary] that the extramarital sexual history of a female witness would be admissible to impeach her credibility in any case in which she testified.'" *United States v. Kasto*, 584 F.2d 268, 271–272, n. 3 (8th Cir.1978) (italics added).

*See also United States v. Stone*, 472 F.2d 909, 916 (5th Cir.1973) (Information regarding government witness's alleged marital infidelity was irrelevant and could not be admitted at criminal trial, used for impeachment or for any legitimate evidentiary purpose since it dealt with a collateral issue), and *United States v. Marchesani*, 457 F.2d 1291, 1297 (6th Cir.1972) (Testimony regarding witness's cohabitation with man not her husband was properly excluded by trial court since it "had no bearing on any issue in the case and would only serve to unnecessarily 'rake over' the witness on the witness stand").

WHEREFORE, plaintiff's motion to set aside the verdict and the request for a new trial is hereby GRANTED, and consequently the judgment entered in this case pursuant to the jury's verdict is hereby VACATED and SET ASIDE and a new trial is ordered. Date of the new trial to be set at a conference to be held on March 6, 1992 at 9:30 A.M.

SO ORDERED.